I'm going to begin the argument. Case number 24-3541 from the Eastern District of Missouri, United States v. Deontae' Overall. I'm going to begin there. Mr. Swanson. And with respect to the government's, what is it, request for inquiry or however, we're not going to do that. Bring it on. May it please the court, counsel. Yes. I'm here today on behalf of Appellant Deontae' Overall. Mr. Overall raised three points on appeal. Unless there are any questions about points one or three, I will focus on point two today. The second point argued that the trial court erred by admitting evidence of uncharged criminal acts. The parties differ as to whether those uncharged acts were extrinsic or intrinsic, which kind of defines the way they're analyzed. Can I just ask a preliminary question? Isn't most of this plein air? Like, some of it's not. You're right. I mean, but at least in the brief. But isn't most of it plein air? No one would argue that it's not, Your Honor. There was a notice of intent to rely on uncharged bad acts, both under 403 and 404, in which the government argued that they were intrinsic. And if not intrinsic, they were extrinsic, but admissible for 404B purposes. There was a response filed to that. And then the court ruled before trial began for that. So to the extent that there's any argument that specific parts of it may not have been objected to during the course of trial, there had been a pretrial ruling. But I think the district court — correct me if I'm wrong, because we have a couple cases, I think, that have some 404B this week. But I think the district court said, like, this is preliminary, and I may change my mind. You know, so you should still object when these things come up. Maybe I'm wrong about that, but I don't recall that. You're not wrong, Your Honor. He did make it very clear. Yeah. And I went over that particular exchange several times because I was trying to parse it, because you're absolutely not wrong, Your Honor. His statement was, make your objections, but my opinion is this is all coming in. And I think in the context of a trial, certainly that obligated the court to — or the defendant to, if he thought anything changed, make an objection. No, wait a minute. That's not right. Make your — and I'll consider them then. It all has to do with the context. And I agree, Your Honor, that it does have to do with the context. But the context is he says, make your objections, and I'll consider them. But he also says, my opinion is this is all coming in. But then counsel says, I think, as long as we're free to bring those up as they occur, then you know I — you may bring up like we should hear more, and then kind of sort of understands it as I can bring these up as we go along. Am I wrong about that? I think he does understand that, and he does do that several times. But I guess, again, in the context of a trial, the back and forth, I don't think any attorney would have stepped away from the pretrial conference without the conclusion that this judge believes this evidence is coming in. And he might believe there was some obligation to make further objections. But the extent of that, it wasn't, look, I'm — you know, a preliminary contingent, I'm reserving my ruling. I guess what I'm saying is this. Generally, here's my preliminary ruling. I think this stuff is fair game, okay? But I will take it with the case. You can make your objections at the time. As I view the case right now, it's coming in, but you're free to make objections. And it's up to you to make those objections as we go forward, period. Instruction noted. Yes, Your Honor. And binding, in my view. And I do understand that. I understand to a certain extent he was inviting further objections. But when he says, you know, it's all fair game, I think attorneys take from that that they can proceed with the idea that these things have been resolved. The government, sure. With warning, don't overplay your hand.  Which is an implicit warning from the Eighth Circuit, if not every district judge. I'm always on 404B issues. If you want to bring in 12 priors, cut it down to three. The rest are not coming in, and your three better be good. And that's fair. And I guess, again, my only argument would be, in this context, that his statement was sufficiently clear that the attorney would have that. So give us the plain error. So in this case, Your Honor, the plain error. And what I was initially saying was you have to categorize the separate, kind of, call them trenches of evidence that were potentially in plain error. There are communications on the phone about drug exchanges unrelated to either the witness who testified, who I referred to as D.D., or the decedent, A.M. Other people before December 2nd going back into November. There are conversations on the phone about that. After December 2nd, December 3rd, there is the exchange between D.D. and the defendant. And then there's two further exchanges involving a police officer in August. And then, finally, there is the search warrant that was executed at an Illinois residence, not the same residence at issue here, in which a whole variety of controlled substances, pictures, whatnot, were seized. So if you take all of those one by one, it's also important to note here that some things, I would absolutely concede, are not objectionable or even wouldn't be plain error. The communication, the first communication between D.D. and appellant where he says, hey, you got any, you know, got any controlled substances? Yeah, I can't make it today, but I'll come tomorrow. That's admissible. The conversations between appellant's phone and the decedent, when they eventually seize the phone, those are certainly admissible. No question there. So it's the other ones, those are the ones that are objectionable. I'll start from the back. I'll start from the back end. When law enforcement gets the search warrant, they go to the Illinois residence. They find the phone. Some things on the phone are going to be admissible, but they also find a large number of controlled substances in that Illinois residence. Those are not the basis of any charge that was brought by the government. They went the basis of litigation. That's purely an uncharged criminal act. It's not intrinsic to the crime. It doesn't prove any element of the crime charged. It doesn't complete the story of the crime charged. It doesn't indicate consciousness of guilt. So it's not 403 evidence. Is it 404 evidence? Well, before I proceed on the 403, I think the relevant analog case for this would be U.S. v. Grady. That's 88 F. 4th, 1246. In that case, the defendant was arrested for an unrelated offense. When he's arrested for the unrelated offense, his cell phone is found. When his cell phone is found, evidence that's relevant to the charge defense. This court found that the details of the later arrest, where the phone is found, that those are not relevant. That's the same thing here. The search warrant, they get the search warrant, they get his phone, they arrest him. All fair game. What they find during that search, though, besides the phone, that's not. So I tend to agree with you that I think that at least some of the texts to other people were probably inadmissible. But I don't agree with you that the controlled buys and what they found during the controlled buys was inadmissible. Because he was arguing that these things I was selling were not fentanyl. I didn't sell the fentanyl that killed him, and I don't sell fentanyl at all. And those could be used to show that actually you sold fentanyl, whatever two months later or three months later, however long it was for the controlled buys. And so if that's true, isn't everything else harmless? If that is admissible, that these controlled buys were admissible, then it really doesn't matter whether he was setting up drug deals with other people. Your Honor, I would say two points. One would be his defense actually, trial, was not, I'm not selling fentanyl. It's just I didn't sell fentanyl on this occasion that I am charged with. When he testified, the defendant said, yes, I sold fentanyl. He also made that statement to law enforcement. So to the extent that evidence may sometimes be admissible to prove a defendant, not this defendant, but a defendant actually does know something about the particular drug he's accused of selling, that's not the case here. Because he did make a statement to law enforcement that he sold fentanyl, just not now. The other point is to the controlled buys. There were three controlled buys, one to D.D., one to, or two to law enforcement. An argument about the sale to D.D., that might go towards some evidence of his knowledge that he was actually doing this during the period, identity. That might have. But the sales to law enforcement later that are completely different, of different controlled substances. They talk about methamphetamines also in those. Those have nothing to do with this offense. The only way they become admissible is essentially by rephrasing a propensity argument as something else. Doesn't it matter, though, that those were almost identical pills according to the testimony, that they had an M30 marking according to the contemporaneous account of the time of the death, but then also later on, that they could be compared to each other? I think it does matter if they're allowed to argue propensity. That's, I think, the issue here. And I think that's where, what saves it, or not saves it, but what prevents it from being a harmless error. You don't think identifying the drug and countering the argument that I didn't sell drugs on that occasion, despite the fact that the pills look identical, you think that's, I don't think that's propensity. And the reason I would clarify that's propensity is because the logical inference you're asking the jury to draw there is basically, I didn't sell drugs on this occasion. You sold identical drugs on this other occasion. Therefore, you must have sold those drugs on this occasion. That's true, but both were fentanyl. That's, that's the key, is you're right up until that point. But when you prove that they're both fentanyl to counter an argument, I don't think, I think that takes it out of the propensity. And I guess the one distinction I would make, and I'll save my three seconds for rebuttal, would be, it wasn't that he said he sold a pill that turned out not to be fentanyl. His defense was, I sold marijuana, which is a categorically a different thing. Okay. I get one second for rebuttal. Thank you. Ms. Eplin. Thank you, Your Honor. May it please the Court, my name is Lisa Eplin. I'm appearing today on behalf of the United States, and I was trial counsel in this case. I wanted to start by clarifying the standard of review that we're talking about for the different tranches of evidence. In terms of what was objected to and not objected to during trial, as Judge Shelp directed the parties to do, the record is clear that the subsequent buys by the testifying witness, Devin Daffner, those were not objected to during trial. Those would be subject to plain error review, as would the execution of the search warrant and everything found at Overalls Residence in August of 2023, as well as the text messages on the phone with different individuals. Those also came in without objection at trial, and so would be subject to plain error review. The undercover buys were objected to during trial. However, I believe Judge Shelp properly overruled that objection, exercised his discretion, did not abuse it in letting those in. And while I'm on that subject, I would just like to make out the point. They weren't totally different. They were for pressed blue fentanyl pills marked with an M30. And the other significant things about the undercover buy was that the person who did the controlled buys, Devin Daffner, was the same witness that was with the victim the night he bought pills and died. His credibility was attacked furiously and continuously during trial, and it's continuing to be attacked on this appeal. So the undercover buys were related and important direct evidence because we have then another individual saying, when you call this phone number, 314-390-8707, Deontay Overall is the person who responds and sells you little blue pills marked with an M and a 30 that test positive for fentanyl. That's, frankly, how they caught the defendant in this case, was doing the undercover buys in addition to the control buys. It's how they got probable cause to get the federal search warrant, and it's how they solved the case. Because on the night of December 3rd, 2022, no one actually saw Deontay Overall place the pills in the victim's hand. And certainly at the time we're putting on evidence, we couldn't know that he would take the stand in his own defense and admit to a drug transaction with a M that night. So the government is put to its burden in the face of a not guilty plea. The one remaining tranche of this challenged evidence that was objected to at trial was the contents on Mr. Overall's phone. And so that is also reviewed under an abuse of discretion. And again, I think Judge Shelp properly exercised his discretion in allowing the contents, and it was limited contents. There were hundreds of text messages, hundreds of conversations, many videos, many notes, and this is all in the pretrial briefing and was discussed at the second pretrial conference. To Judge Loken's earlier point, we chose five photos. We played one video, and we narrowed our selection of those things very narrowly to what is permissible under 404B. And the questions about them were also narrowly tailored to the defendant's motive for dealing drugs, his knowledge that, in fact, these little blue pills were a controlled substance, which we anticipated being a confusing issue in this case since Percocet is sometimes, when prescribed, a legal drug. So we kind of anticipated that coming up and wanted to make it clear that this defendant knew he was selling a controlled substance, which is an element that we must prove in the case. So, and also, and it affirms what the- On knowledge, I just want to ask, how does, how is knowledge proven? I understand how it's proven in maybe some possession case, knowledge of selling illegal drugs. But I wonder whether, and it wouldn't be legal for him to sell Percocets either because he's not a pharmacist or a doctor or whatever. So I'm trying to figure out how that, how that, how that establishes knowledge. I mean, it does establish what the drug is, but knowledge seems to me to be a little bit of a reach by the government. Well, Judge, and so what we argued with respect to knowledge, particularly at closing, was that he knew what he was doing because he argued or he said to, he said to police that, you know, Percocet can be a legitimate drug. And so we argued that he knows the drug world. He has this intimate knowledge of drug sales. And so he knows what he's doing, handing out these drugs for this high price. He knows he's selling a controlled substance, an illegal substance in these M30 pills. Wouldn't he know if there were Percocet 2 that he was selling, that it was illegal for him to sell Percocet? We, Judge, that was one thing that we anticipated would be confusing to the jury and that we would need to prove, which is why we wanted to bring in this evidence of knowledge that, you know, if you think it's legal for you to sell Percocet, you're not doing it hand-to-hand in a car. You're not doing it for stacks of cash. You're not selling legal Percocet for $15 a pill. No one's going to buy that when you could go to a pharmacy. So to us, your question was an important one. How do we prove to the jury that he knows he's selling a controlled substance, whether it's Percocet that at one point came from a pharmacy or whether it's these totally illicit pressed fentanyl, counterfeit Percocet pressed fentanyl pills? Judge Strass, I wanted to also point out with respect to some of the text messages from other people and the defendants, there were also hundreds of text messages. And these text messages, especially as the case evolved, were certainly intrinsic to the case, particularly the text messages that showed how the victim came to be introduced to the defendant, particularly through an individual named Daniel Pauline, who contacted the defendant two weeks before the victim's death about purchasing these pills for $15 a pill. He said two for $30, five for $75. And on November 23rd, these text messages show that individual, Daniel Pauline, was unable to complete his transaction with the defendant. And so he sent the victim, A.M., up to that 856 Elias address to complete the sale. Yeah, I think that's fine. The stuff that I think gets to the edge is the stuff where they're completely like unrelated transactions. Oh, I sold drugs last week to somebody else. I don't quite understand that part of it. So there were only—and I know each of these text messages. So one was a woman named Kaylee Frost. Her text messages with the defendant were on December 1st, two days before the events in our case. And she was the one that gave Daniel Pauline his number. So the way that these text messages show the defendant operated was you had to know somebody before he would deal with you. So she was dealing with him, and then Pauline said, hey, I got your number through Kaylee. And then the victim in our case said, hey, I got your number through Danny. I'm Danny's boy. So she was directly related to the case because she was directly how the number got passed through. Another one of the individuals, Biker Boy, the evidence established during Detective Walsh's testimony, that they believed he was Harry Tuttle, who was the only other possible drug source that the victim might have had through this whole thing. And the defense explored that vigorously on cross-examination of Detective Walsh. And so on redirect, we brought in that, yes, this other potential source for the victim, even he was sourcing drugs from the defendant in this case. He's not outside the case. He was related. So you're saying that all the text involved people and involved instances in which it was related to what the victims, it's the direction of the victims towards overall. There were two that weren't. They were to people who weren't called Trip and My Dude. The My Dude texts were never published to the jury. We didn't even get to those. We left those go. The Trip text was shown, and it is related to the case, Judge, I believe, in that it's the person on the other end of the phone saying, come to 856 Elias. And then all of the other evidence in this case, you know, one of the ways that we proved that it was the defendant who was the perpetrator is we tied him very tightly to 856 Elias. And that Trip text was close in time to the events that we're talking about. I believe it was November 19th. So arguably, those two texts may have been relevant for 404B or another purpose, but I believe particularly unpublished texts would have been completely harmless. And then the one it wasn't dwelt on, it was a quick text, and it was showing whoever was on the other end was directing someone to 856 Elias for drug sales. Although if the controlled buys come in, I think all this argument about everything else kind of falls away, because that is, I mean, I realize the government presented a lot more, but I can't imagine that that isn't enough to establish in the jury's mind all that the government needed. I would never say that as someone walking into a trial. Certainly retrospectively, I would agree with that, if we're interpreting everything in the light most favorable to the jury's verdict. And also, judge, in light of the other cases in this circuit, I mean, that is a common tactic that law enforcement does after an overdose death, where we have a phone number and we're trying to prove who's the person on the other end of this number. The 2023 Cardwell case, they did that. They did two controlled buys following the overdose. They never charged those buys. It was simply they charged the overdose. Those buys came in as evidence of the defendant's guilt and how they caught him. It completed the story as to who is the person doing this. And also, to your Honor's point, in the Cardwell case, those capsules, those black and white capsules that they purchased on the buys, they then did the same thing. They matched it up to drugs that had been seized on the date of the overdose and said these match, just like in our case. Devin Daphner testified, yes, those look just like the pills that the victim bought that night. And I see that I'm out of time, so I thank your Honors. Thank you. All right. Is it time? I'll give you a minute for rebuttal. Well, I think issues have been covered, but maybe not. I'll take my minute, your Honor. Just very briefly, the government argued that they wouldn't know what Mr. Overall's testimony was going to be when they started the trial. They had a statement of him when he was interviewed. During that interview, he's asked, are you selling drugs over there? Yes. He says he knows about Perks. He says people come to that Elias house. They knew. They had a statement that he was selling drugs. They didn't need to wait for his testimony. The government tried to defend the controlled buys by the non-law enforcement witness. Leave those aside for a moment. There were two other controlled buys with law enforcement that would not do anything to rehabilitate that witness's credibility. And last, I would say with regards to the text messages, it's the difference between prologue and prequel. Prologue, you need that for your story. Prequels are a completely separate story. And so all those text messages beforehand, those are prequels. They are other drug instances, mission to be admitted. If there's nothing further, there you are. Thank you. Very good, counsel. The case has been thoroughly briefed. Arguments have been helpful. We'll take it under advisement. Thank you, Your Honor. Thank you, Your Honor.